*Erica J. Hall Houser v. Nicholas A. Houser*, No. 2220, Sept. Term 2022.  Opinion by Arthur, J.

**FAMILY LAW – CHILD SUPPORT – USE OF CHILD SUPPORT GUIDELINES**

Section 12-202(a)(1) of the Family Law Article of the Maryland Code (1984, 2019 Repl. Vol.) mandates that courts use the child support guidelines in any proceeding to establish or modify child support.  The court must award the amount dictated by the guidelines unless it determines that "the application of the guidelines would be unjust or inappropriate in a particular case."  FL § 12-202(a)(2)(ii).  If the court determines that the application of the guidelines would be unjust or inappropriate, it must make specific findings, including a finding about how deviating from the guidelines serves the child's best interest.  FL § 12-202(a)(2)(v).

In this case, both parents submitted a child support agreement proposing that the father would have no child support obligation.  The Circuit Court for Anne Arundel County refused to accept the agreement because the parents failed to provide any justification to support a deviation from the guidelines.  Instead, the court applied the statutory guidelines and ordered the father to make monthly payments.  The parents appealed, arguing that their agreement was in the best interest of their child and that the court's refusal to accept their agreement was a violation of their fundamental right to direct the care, custody, and control of their child.

The Appellate Court of Maryland held that even if parents have created an agreement regarding child support, the circuit court must apply the statutory guidelines unless the court finds that doing so would be unjust or inappropriate.  Although the court may deviate from the guidelines, Maryland courts do not permit parents to agree privately to waive child support altogether.  The right to receive child support is a right that belongs to the child.  Accordingly, the circuit court found no reason to deviate from the guidelines, and thus, did not err in its use of the guidelines.

**CONSTITUTIONAL LAW – RIGHT TO DIRECT THE CARE, CUSTODY, AND CONTROL OF CHILDREN – OBLIGATION TO PAY CHILD SUPPORT**

In *Troxel v. Granville*, 530 U.S. 57, 65 (2000), a plurality of the United States Supreme Court held that a Washington state statute permitting a court to order a parent to grant visitation rights to third parties deprived parents of substantive due process because it infringed upon their "liberty interest" in "the care, custody, and control of their children." The opinion did not address a parent's legal obligation to pay child support.  Prior to *Troxel*, the Court held in *Rivera v. Minnich*, 483 U.S. 574, 580 (1987), that a father has no "liberty interest in avoiding financial obligations to his natural child that are validly imposed by state law."

The liberty interest discussed in *Troxel* does not entitle parents to exculpate one another from their legal obligation to support their children. The circuit court did not err in rejecting the parents' contention that the parents had a constitutional right to agree that the father would pay no child support.

Circuit Court for Anne Arundel County
Case No C-02-FM-20-002520

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 2220

September Term, 2022

_____

ERICA J. HALL HOUSER

V.

NICHOLAS A. HOUSER

_____

Arthur,
Shaw,
McDonald, Robert N.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Arthur, J.

_____

Filed: August 1, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

* Ripken, J., did not participate in the Court's
decision to designate this opinion for
publication pursuant to Md. Rule 8-605.1

The parents of a five-year-old child agreed that the father would have no obligation to support the child even though the mother would have primary physical custody and the father's income is more than twice the mother's. The Circuit Court for Anne Arundel County refused to accept the agreement. Instead, the court ordered the father to make monthly child support payments in accordance with the Maryland child support guidelines, Maryland Code (1984, 2019 Repl. Vol.), § 12-204 of the Family Law ("FL") Article.

The parents appealed. They argue, among other things, that the court's order violated their fundamental right, as fit parents, to determine how much to spend on the support of their child.

For the reasons stated in this opinion, we affirm the judgment of the circuit court.

**BACKGROUND**

**A. Initial Divorce Proceedings**

Erica Hall Houser ("Mother") and Nicholas Houser ("Father") were married in 2012. They have one child, who was born in 2018. The parties separated on February 14, 2020, with the intent to end their marriage.

Mother initiated divorce proceedings on September 18, 2020. Among other things, Mother requested sole custody of the child, as well as child support payments, including payments retroactive to the date of her complaint.

Father filed a counterclaim on October 13, 2020. He too requested sole custody of the child, as well as child support payments, including payments retroactive to the date of

filing his counterclaim. He later amended his counterclaim to include additional allegations and theories, but his request for relief remained the same.

The parties reached an agreement concerning pendente lite custody and access to the child, but were unable to reach an agreement on other issues. Consequently, the court scheduled a merits hearing for January 24, 2023.

**B. The Three Agreements**

On January 19, 2023, just days before the scheduled hearing, Mother and Father entered into three agreements, titled: Property Settlement Agreement; Custody and Parenting Agreement; and Child Support Agreement.

The Property Settlement Agreement and the Custody and Parenting Agreement are relatively straightforward. The Child Support Agreement is not.

In the Property Settlement Agreement, the parties agreed that Mother would continue to hold, reside in, and have exclusive use of the family home in Edgewater, Maryland. Father waived all equity, interest, and rights in the home. Mother would have sole liability on the mortgage on the home. Mother and Father also agreed to discharge each other from alimony obligations and from any rights to their respective retirement assets.

The Custody and Parenting Agreement set forth the parties' agreement regarding the custody and control of the child. Mother and Father agreed to joint legal custody of the child. Mother would have primary physical custody; Father was entitled to five overnight visits every two-week period.

In the Child Support Agreement, Mother and Father began by acknowledging that Father had not paid any child support to Mother. They calculated Father's child support arrearages at "approximately $41,708." "However," Mother and Father "agree[d] that there are no child support arrears as of the date of this Agreement and [Mother] waive[d] any entitlement to child support arrears."

In the Child Support Agreement, Mother and Father also agreed that the Maryland child support guidelines were "inapplicable to their case." They asserted that because their household combined income exceeded $15,000.00 per month, theirs was an "above-guidelines" case, to which the guidelines[1] do not strictly apply. *See, e.g.*, *Ruiz v. Kinoshita*, 239 Md. App. 395, 425 (2018). "[A]fter consulting" the guidelines "and considering the best interests of their minor child," Mother and Father "agree[d] that each party shall each [sic] be generally charged with support for the minor child when he is in their respective care and custody." In other words, Mother and Father agreed to a "waiver of child support." The parents "both agree[d]" that the waiver of child support was "in the best interests of the minor child."

In the Child Support Agreement, Mother and Father also agreed that the agreement "shall not be modifiable for at least a period of twenty-four months from the date of execution."[2] Mother and Father "recognize[d]" that under Maryland law "child

---

[1] The General Assembly has increased the limits of the guidelines to $30,000.00 per month, but the change applies only to cases filed after the effective date of the act. See 2020 Md. Laws ch. 384, § 2.

[2] *But see Guidash v. Tome*, 211 Md. App. 725, 741 (2013) (holding that an agreement purporting to prohibit a court from modifying the amount of child support "did

3

support must be determined by considering the best interests of the minor child." Nonetheless, they "agree[d] that any modification of" the agreement "would not be in the best interest of the minor child." They recited that they had "reached this agreement in consideration for many factors and considerations [sic], some of which would not be considered by a court of competent jurisdiction if this matter were to be decided by that Court."

The Child Support Agreement did not identify the "factors and considerations" that a court would not consider or why a court would not consider them. The agreement, however, did provide that if either party attempted to modify the agreement in contravention of the prohibition on modification for at least 24 months, that action "would immediately constitute a material change in circumstances" under the Custody and Parenting Agreement, entitling the other parent to ask a court to alter the custody arrangement.

Under the Child Support Agreement, Father agreed to continue to maintain health insurance for the child, but Mother would be responsible for the first $6,000.00 per year in extraordinary medical expenses. Father and Mother would split the extraordinary medical expenses once they exceeded $6,000.00 in any given year.

---

not limit the circuit court's authority to revisit this issue in light of changed circumstances" and "[was] void as violative of the clearly-established public policy of this State"); *Corapcioglu v. Roosevelt*, 170 Md. App. 572, 606 (2006) (stating that "[a] parent may not bargain away the child's right to support, and modification of that support, from the other parent"); *Lieberman v. Lieberman*, 81 Md. App. 575, 588 (1990) (stating that "[a] parent cannot agree to preclude a child's right to support by the other parent, or the right to have that support modified in appropriate circumstances").

4

Finally, in the Child Support Agreement, Mother was to be solely responsible for the cost of all extracurricular activities and for all work-related childcare expenses.

**C. Merits Hearing**

On January 24, 2023, Mother and Father appeared before the Circuit Court for Anne Arundel County for a hearing on the merits. The court knew that the parties had reached a settlement.

At the outset, Mother's counsel informed the court that the parties had done "something a little unique in this case." He explained that the parties had executed three separate agreements because they did not "want the Court to use the child support guidelines." He asked the court to consider two ways of proceeding. First, if the court required the use of the child support guidelines, then counsel would ask the court to incorporate, but not merge, two of the agreements into the judgment, but not to incorporate or merge the child support agreement. Second, if the court allowed Mother and Father to "deviate," in his words, from the child support guidelines, then counsel would ask the court to incorporate all three agreements into the judgment.

After ascertaining that the guidelines dictated a child support payment from Father to Mother, the court asked, "[W]hat are you asking me to do with child support?" Counsel for Mother answered, "Zero." The court asked, "Why." Counsel responded, "Well, basically that is what their agreement is." Counsel also referred obliquely to "other agreements with respect to property" and "the way that they are going to deal with things."

The court responded that it was "not willing . . . to just waive child support." It explained that it would be required to make a "difficult finding" that it is "in the best interest of the minor child . . . to receive no child support."

Counsel for Mother asked the court to incorporate the Parenting Agreement and the Child Custody Agreement, but not the Child Support Agreement, into the judgment. The court responded: "If I am resolving child custody, I have to address child support as well." When counsel objected that the Family Law Article does not require the court to fix the amount of child support when the parents have "resolved" the issue of support, the court responded: "There is case law that says that the Court has an obligation to explore child support and to order child support."

The court engaged in a colloquy with counsel for both parents in an effort to ascertain whether there was some basis to depart from the guidelines. Through the colloquy, the court learned that the child was less than five years old and that Father was waiving his interest in the marital home, but that the amount of equity in the home was not much, even before paying the costs of sale. When Father's counsel reiterated that the parents believed that the waiver of child support was in the child's best interest, the court responded: "It is in their best interest[;] it is not in the child's best interest . . . to receive no child support." When counsel persisted, the court repeated that it could not deviate from the guidelines unless it made a "finding that it is in the best interest of the child." "And," the court added, "there is just nothing you have said so far that gets me there."

At this juncture, counsel for Mother acknowledged that the Family Law Article authorized the court to set child support,[3] but asserted that Father and Mother have a constitutional right to decide how to raise their child. Counsel claimed that, as a constitutional matter, a court could not second-guess the decision of "fit and proper parents" that it is not in their child's best interest for a court to order child support. The court disagreed with counsel's contention.

Counsel for the parents requested a recess. When they returned, they told the court that they would like to move forward to obtain a divorce. Counsel recognized that the court could call the parents as witnesses, ask them questions under oath, and make a determination about child support. The court responded: "That is the way that I am going to proceed if we are going to be addressing custody."

Mother took the stand. In response to the court's questions, she testified, over objection, that she was employed as a project manager for a software development company. Her annual salary was "around" $74,000.00 a year. She paid for the child's daycare costs, which amounted to about $1,386.00 a month. When asked by the court if there was "some reason" why she was not seeking child support payments, Mother responded:

> I believe that his relationship is the most important and we have gone our separate ways and supported ourselves and our child financially independently thus far and have done well, I think. And so moving forward I would prefer not to have to deal with any money.

---

[3] Counsel stated: "So obviously 12-201 and 12-202(a) provide the Court with the authority to set child support."

7

The court asked Mother whether she believed that "the father has an obligation to assist in supporting the child." She responded that "he does."

Mother confirmed that the child would stay overnight with her roughly 61 percent of the time and with Father roughly 39 percent of the time. She also confirmed that Father had paid no child support since the separation.

Next, the court called Father to testify. Over objection, Father testified that he was currently employed as an IT engineer or architect and that he had an annual salary of $170,000.00 per year. In response to questions from his own counsel, Father testified that he spent "anywhere between [$]100 and [$]150" a month for the child's health insurance. The court said that it would use the higher figure, of $150.00 per month, in calculating child support.

At the close of testimony, the court determined that the guidelines dictated a child support obligation of $2,105.00 per month. Then, the court considered various avenues to justify a deviation from the guidelines.

The court found that there was less than $20,000.00 in equity in the marital home, after deducting the likely costs of sale. Consequently, the amount of equity was "not a significant figure that would permit [the court] to deviate from the guidelines[.]" The court considered a deviation for travel costs, but rejected it, because the parties live in relatively close proximity to one another.

Mother's counsel argued that Mother and Father were "fit and proper persons" to have legal and physical custody. He asserted that if Mother and Father were capable of making "sound fundamental decisions" pertaining to custody, they should also be

permitted to make a decision not to require child support. "There is no better person on the planet . . . than the biological parents of a child," he argued, to decide "what they believe is in their child's best interest."

The court responded that it had heard no reason "other than . . . this is what the parents would like to do." Counsel for Mother replied, "[T]hat is exactly the argument." He asserted that under *Troxel v. Granville*, 530 U.S. 57 (2000),[4] Mother and Father have a "fundamental right to parent" and that the courts cannot "second guess" what they have said is in the best interest of their children.

The court disagreed, stating that it "has an obligation to look out for the best interest of the minor child." The court could think of "no reason . . . why [Father] shouldn't pay his proportional share." It explained that it could not justify deviating "from $2,105 to zero." The court accepted the Child Support Agreement into evidence, but did not incorporate it into the judgment for absolute divorce.

Ultimately, the court ordered Father to pay $2,105.00 per month in child support, beginning on February 1, 2023. It permitted Father to make the payment directly to Mother rather than to the Office of Child Support Enforcement.

---

[4] As discussed in greater detail below, *Troxel v. Granville* concerned a state statute that authorized "[a]ny person" to petition a court for visitation rights "at any time" and authorized the court to grant visitation rights whenever, in the court's judgment, "visitation may serve the best interest of the child." *Id*. at 60 (quoting Wash. Rev. Code. § 26.10.160(3) (1994)). A plurality of the Court held that the statute violated a fit parent's substantive due process right to make decisions concerning the care, custody, and control of her children. *Id.* at 72-73.

In addition, the court found that Father had a child support arrearage of $41,708.00. It ordered Father to pay off the arrearage at the rate of $195.00 per month.

In conclusion, the court stated:

> The parties' agreement to exchange no child support has not been justified in any way that I can see other than they believe as Counsel pointed out that as two fit parents, they are entitled to make that decision on their own and I don't think the case law supports that. Maybe the legislature will change it at some point but that is where we are at this point.

Mother noted a timely appeal on February 13, 2023. Father noted a timely appeal on February 15, 2023. Both Mother and Father ask this Court to vacate the child support order and to allow Mother and Father to waive the child support obligation.

## QUESTIONS PRESENTED

On appeal, Mother presents three questions for review. Father presents the same three questions.

1. Did the trial court err when it issued a child support order after the parties had voluntarily withdrawn child support as a justiciable issue, and the court did so over the objections of the parents who the court found to be fit and proper?

2. Did the trial court mis-apply [sic] the statute, or abuse its discretion, when the court ordered child support and arrears over the express objection of the parents who the court found to be fit and proper?

3. Did the trial court violate the parents' constitutional rights when the court ignored their agreement regarding child support when the parents were found to be fit and proper?

Although Mother and Father are adversaries in name, they request the same relief: reversal. Father's brief largely incorporates the arguments in Mother's.

Because Mother and Father both contended that the circuit court had erred and that it had violated their constitutional rights in ordering Father to pay child support, we asked

10

the Attorney General to file an amicus brief. We asked the Attorney General to address two issues:

1. May a court apply the statutory child support guidelines when the parents have reached an agreement regarding the level of child support?

2. Do the Maryland cases concerning the parents' ability to waive child support remain good law after *Troxel v. Granville*[, 530 U.S. 57 (2000)]?

The Attorney General filed an amicus brief in response to our request. In summary, he argues (1) that a court must follow the guidelines unless it would be unjust or inappropriate to do so and (2) that *Troxel v. Granville* does not require a court to endorse an agreement in which the parents have agreed to forgo child support.

### STANDARD OF REVIEW

"The trial court's decision as to the appropriate amount of child support involves the exercise of the court's discretion." *Guidash v. Tome*, 211 Md. App. 725, 735 (2013). "A court can abuse its discretion when it makes a decision based on an incorrect legal premise or upon factual conclusions that are clearly erroneous." *Id*. However, "where the [child support] order involves an interpretation and application of Maryland statutory and case law, [the] Court must determine whether the [trial] court's conclusions are 'legally correct' under a *de novo* standard of review." *Walter v. Gunter*, 367 Md. 386, 392 (2002).

### DISCUSSION

The parents' first two contentions are variations of one another. First, they assert that the court erred in addressing the issue of child support after they had "withdrawn" it

from consideration. Second, they assert that the court erred or abused its discretion in awarding child support over their objections. Because these contentions are closely related, we shall address them together.

We begin with a pair of elementary propositions. First, parents have a legal obligation to support their children. *See, e.g.*, *Drummond v. State ex rel. Drummond*, 350 Md. 502, 520 (1998); *Petrini v. Petrini*, 336 Md. 453, 459 (1994); *Durkee v. Durkee*, 144 Md. App. 161, 182 (2002); *Shrivastava v. Mates*, 93 Md. App. 320, 327 (1992); *see* FL § 5-203(b)(1) (stating that parents "are jointly and severally responsible for the child's support, care, nurture, welfare, and education[]"). Second, because of the State's role as *parens patriae* or the protector of those who cannot protect themselves, "it is the duty of a court to consider the child's best interest" in matters pertaining to child support. *See, e.g.*, *Geramifar v. Geramifar*, 113 Md. App. 495, 503 (1997).

FL § 12-202(a)(1) states the general rule that, "in any proceeding to establish or modify child support . . . , the court shall use the child support guidelines . . . ." "As the language of the provisions ma[de] clear, '[i]t is mandatory that the statutory guidelines be used. No deviation from the cookbook methodology may be made.'" *Allred v. Allred*, 130 Md. App. 13, 17-18 (2000) (quoting John F. Fader II and Richard F. Gilbert, *Maryland Family Law* § 8-3 (2d ed. 1995)).

A purpose of the guidelines was "to remedy the unconscionably low levels of many child support awards when compared with the actual cost of raising children, to improve the consistency and equity of child support awards, and to increase the efficiency in the adjudication of child support awards." *Petrini v. Petrini*, 336 Md. at

12

460. The conceptual underpinning of the guidelines is that children should receive the same proportion of parental income, and thereby enjoy the same standard of living, as they would have experienced had their parents remained together. *Voishan v. Palma*, 327 Md. 318, 322 (1992).

"There is a rebuttable presumption that the amount of child support which would result from the application of the child support guidelines . . . is the correct amount of child support to be awarded." FL § 12-202(a)(2)(i). Thus, a court must award the amount of child support dictated by the guidelines unless it determines that "the application of the guidelines would be unjust or inappropriate in a particular case." FL § 12-202(a)(2)(ii). If the court determines that the application of the guidelines would be unjust or inappropriate, it must make specific findings, including a finding about how its conclusion serves the child's best interest. FL § 12-202(a)(2)(v).

Although a court may depart from the guidelines when they generate an unjust or inappropriate result, Maryland courts have repeatedly stated that parents may not waive the obligation of child support. For example, in *Walsh v. Walsh*, 333 Md. 492, 503 (1994), the Court remanded the case for a determination of whether the father's cessation of mortgage payments was a material change of circumstances that warranted a reconsideration of the amount of his child support obligation. For guidance on remand, the Court stated:

> [W]hile parties are encouraged to settle domestic disputes, when doing so, they must be mindful of the needs of their children. When a judge approves and incorporates an agreement of the parents into an order of support, the judge must do more than merely rubber stamp anything to

13

which the parents agree. Judges have an obligation to assure that children do not suffer because of any disparate bargaining power of their parents.

*Id.* at 503-04.

The Court added: "Even before the guidelines, this Court made it clear that agreements between the parents were not binding on a court ordering child support." *Id.* at 504 (citing *Stancil v. Stancil*, 286 Md. 530, 535 (1979)).

The Court expressed a similar proposition in *Stambaugh v. Child Support Enforcement Administration*, 323 Md. 106 (1991). In that case, a mother had agreed to waive child support arrearages in exchange for the father's agreement to consent to the adoption of the children by the mother's husband. *Id.* at 109. In holding that the agreement violated public policy and was invalid, the Court stated, "Generally, the duty to support one's minor children may not be bargained away or waived." *Id.* at 111.

On several occasions, this Court has reiterated the principle that parents may not bargain away their legal obligation to support their children. *See, e.g.*, *Guidash v. Tome*, 211 Md. App. 725, 739 (2013) (stating that "parents may not waive or bargain away a child's right to receive support"); *Bornemann v. Bornemann*, 175 Md. App. 716, 731 (2007) (stating that "the duty to support one's child cannot be waived by contract"); *Corapcioglu v. Roosevelt*, 170 Md. App. 572, 606 (2006) (stating that "[a] parent may not bargain away the child's right to support, and modification of that support, from the other parent"); *Shrivastava v. Mates*, 93 Md. App. 320, 327 (1992) (stating that "[t]he law and policy of this State is that the child's best interest is of paramount importance and cannot be altered by the parties"). "Any such agreement is at odds with the public policy in

favor of responsible parents supporting their children financially." *Corapcioglu v. Roosevelt*, 170 Md. App. at 606.

"A parent owes this obligation of support to the child, not to the other parent[.]" *Knott v. Knott*, 146 Md. App. 232, 247 (2002); *accord Guidash v. Tome*, 211 Md. App. at 742 (stating that the father's "obligation to pay child support is to his son, not his former spouse"); *Rand v. Rand*, 40 Md. App. 550, 554 (1978) (stating that "[t]he fixing of child support derives from the obligation of the parent to the child, not from one parent to another"). "[N]o agreement, regardless of its terms, can relieve [a parent] of that obligation." *Guidash v. Tome*, 211 Md. App. at 742. Because the right to support belongs to the child and not to a parent, a parent is unable to trade away the right to child support in exchange for something of value to the parent alone.

Not only is a parent unable to bargain away a child's right of support, but there are strong policy reasons to prohibit agreements to waive child support:

> The State has a vested interest in requiring a responsible parent to support his or her child. Otherwise, the State could be responsible in whole or in part for the support of a minor child, even though a parent is financially able to meet those obligations. We hold that a parent may not, even potentially, shift the burden of support to the State.

*Lieberman v. Lieberman*, 81 Md. App. 575, 588 (1990).

And, as the Attorney General argues in his amicus brief, "power imbalances between spouses, including circumstances where one spouse fears violence by the other," may make it difficult to assess whether the spouses have freely entered into an agreement to waive child support. "Judges have an obligation to assure that children do not suffer because of any disparate bargaining power of their parents." *Walsh v. Walsh*, 333 Md. at

15

504. By adhering to the guidelines unless it would be unjust or inappropriate to do so, courts can avoid the possibility that they may approve putative agreements that result from pressure, fear, or other power imbalances.

Against this body of authority, Mother and Father argue, first, that the court erred in awarding child support because, they say, they had voluntarily withdrawn the issue from consideration. They claim that the issue of child support was no longer "justiciable." We disagree.

In their pleadings, both parents had requested child support (and an award of child support arrearages). On the morning of the merits hearing, they asked the court to approve their agreement on child custody as well as their agreement on child support. They purported to withdraw the issue of child support only after the court told them that it would not approve an agreement to waive child support altogether. In these circumstances, allowing the parents to withdraw the issue of child support would be tantamount to allowing them to waive the child's right to support, which they cannot do. *See*, *e.g.*, *Stambaugh v. Child Support Enforcement Admin.*, 323 Md. at 111; *Guidash v. Tome*, 211 Md. App. at 739; *Corapcioglu v. Roosevelt*, 170 Md. App. at 606; *Shrivastava v. Mates*, 93 Md. App. at 327. A rule prohibiting parents from waiving their children's right to support would have little efficacy if the parents could prevent a court from enforcing the rule through the simple expedient of purporting to withdraw the issue of support from the court's consideration.[5]

_____

[5] Father characterizes the effort to withdraw the request for child support as an oral amendment of the pleadings. He asserts that a court has no power to address issues not

16

Mother and Father advance several contentions in support of their second argument, that the court erred or abused its discretion in awarding child support over their objection. None have merit.

Mother and Father begin by arguing that the guidelines apply only in "contested" cases, but that their case was not "contested" because they had reached an agreement to waive the child's right to support. This argument is nothing more than a variant of their fallacious argument that the court could not award child support because they had "withdrawn" the issue. The parents can say that the case was "uncontested" only because they purported to withdraw the issue of child support, which they cannot do.

Mother and Father rely prominently on *Ruppert v. Fish*, 84 Md. App. 665, 674 (1990), a case concerning FL § 8-103(a). That statute permits a court to "modify any provision of a deed, agreement, or settlement with respect to the care, custody, education, or support of any minor child of the spouses, if the modification would be in the best interests of the child."

In *Ruppert v. Fish*, 84 Md. App. at 668, the parents' agreement gave the father the right to "choose the child['s] education[.]" This Court affirmed an order modifying the agreement to prohibit the father from moving the child to another school as a new school year was about to begin, but vacated an order allowing the father to continue to choose which school the child would attend in subsequent years. *Id.* at 676-77. On remand, the

---

framed by the pleadings. Father fails to recognize that, under Maryland Rule 2-341(b), a party can amend a pleading within 15 days of trial only by leave of court. Here, the putative amendment occurred on the morning of the trial itself. Neither party sought or obtained leave of court for the purported amendment.

mother would have the opportunity to show that it was no longer in the child's best interests for the father to choose which school the child would attend. *Id.* We cautioned that, on remand, "it [was] not for the court to decide where [the child] goes to school; it [was] merely for the court to determine whether it remains in [the child's] best interest for that decision to be made by [the father.]" *Id.* at 676.

Mother and Father highlight some of this Court's comments concerning a court's statutory ability to modify an agreement with respect to care, custody, education, or support in the child's best interests. They point to the statement that "[t]he parents of a minor child are generally free to enter into an agreement respecting the care, custody, education, and support of their child[ren]." *Id.* at 674. They stress this Court's assertion that the parents "are the persons who *ought* to decide those things." *Id.* (emphasis in original). They also stress this Court's declaration that a "court should presume" that the parents acted in their children's best interest and that parents "will not ordinarily agree in writing to act in a manner detrimental to their children." *Id.* at 675.

In the comments highlighted by the parents, this Court discussed how a court should proceed when one parent asks the court to modify an agreement with respect to care, custody, education, or support in the child's best interests. Through its qualified statements that parents are "*generally* free" to enter into agreements respecting the support of their children, that courts "should" indulge a rebuttable presumption that the parents acted in the best interest of their children, and that parents "will not *ordinarily* agree" to act in a manner detrimental to their children, this Court did not override the many subsequent cases that say that "the judge must do more than merely rubber stamp

18

anything to which the parents agree";[6] that "[j]udges have an obligation to assure that children do not suffer because of any disparate bargaining power of their parents";[7] that, "[g]enerally, the duty to support one's minor children may not be bargained away";[8] that "the child's best interest is of paramount importance and cannot be altered by the parties";[9] and that "no agreement, regardless of its terms, can relieve" parents of the obligation to support their children. *Guidash v. Tome*, 211 Md. App. at 742.

Mother and Father address none of the language in any of the many cases that say that parents may not bargain away a child's right to support.[10]  Nonetheless, they argue that the legislature "acknowledged and approved of the 'bargaining' of child support." They cite FL § 12-202(a)(2)(iii)(1), which permits a court to depart from the guidelines if an agreement provides for other forms of financial support for a child.  They assert that the circuit court abused its discretion in "fail[ing] even to consider that provision," but they point to no agreement by which Father undertook to provide other forms of financial

---

[6] *Walsh v. Walsh*, 333 Md. at 504.

[7] *Id.*

[8] *Stambaugh v. Child Support Enforcement Admin.*, 323 Md. at 111.

[9] *Shrivastava v. Mates*, 93 Md. App. at 327.

[10] The only case that they cite is *Walsh v. Walsh*, which, they say, "deals solely with the trial court's conclusion that the cessation of the father's mortgage contribution was not a material changes [sic] in circumstances."  They do not address the Court's guidance on remand, including its injunction that "the judge must do more than merely rubber stamp anything to which the parents agree" and that "[j]udges have an obligation to assure that children do not suffer because of any disparate bargaining power of their parents." *Walsh v. Walsh*, 333 Md. at 504.

support for the child. Instead, they criticize the court for noting the minimal amount of equity that Mother would receive in the agreement by which she received the marital home (and the accompanying debt obligation). Their argument does not identify any errors in the circuit court's decision.

Mother and Father go on to assert that under FL § 12-202(b)(1)(i) "[a] court may decline to establish a child support order if the parent who would have the obligation to pay child support . . . lives with the child who would be the subject of the child support order and is contributing to the support of the child." They claim the benefit of this provision because the child lives with Father 39 percent of the time. The parents did not make this argument in the circuit court, so it is not preserved for appellate review. Md. Rule 8-131(a). But even if it were preserved, their argument would seem to permit a court to dispense with child support in most, if not all, cases in which the parents have shared physical custody. *See* FL § 12-201(o)(1) (defining "shared physical custody" to mean "that each parent keeps the child or children overnight for more than 25% of the year and that both parents contribute to the expenses of the child or children in addition to the payment of child support"). That could not be what the guidelines intended. In any event, FL § 12-202(b)(1)(i) is discretionary—the court "may decline to establish a child support order" in certain circumstances. FL § 12-202(b)(1)(i) does not obligate the court to decline to establish a child support order.

Mother and Father argue that the maximum amount of support is not always in the child's best interest. They cite *Petitto v. Pettito*, 147 Md. App. 280, 304 (2002), in which this Court stated: "more can mean less; although appellant seems to suggest that it is

20

always in a child's best interest to receive the maximum possible amount of monetary aid, that is not necessarily so." They ignore the context of this Court's statement: a dispute about whether an agreement required a Maryland court to calculate child support in accordance with the (higher) guidelines applicable in Massachusetts, a state to which the parties no longer had any connection. We explained:

> Use of the child support guidelines of a state wholly unrelated to the parties, except by an outdated agreement, could result in a financial hardship to a parent. In turn, the financial burden on a parent could have an adverse impact on the child, because a parent who is under undue financial pressure may not be able to meet a child's ongoing emotional needs, which are clearly important to the child's healthy development.

*Id.*

*Petitto* affords no support to the parents' contention that the circuit court in this case erred or abused its discretion in applying the guidelines despite the parents' agreement to waive child support.[11]

Finally, Mother and Father cite *In re Joshua W.*, 94 Md. App. 486, 504 (1993), which states that "a downward departure from the guidelines could be justified as in the best interest of a child in foster care if the court found, in the proper case, that such an adjustment was necessary for the parent to obtain the economic stability necessary to regain custody and care properly for the child." *In re Joshua W.* concerns a father's obligation to pay child support to the State when his children are in foster care because

---

[11] In fact, *Petitto* recognizes that an agreement between the parents cannot take priority over the best interests of the child (*id.* at 303), that "[p]arents cannot waive or bargain away appropriate child support" (*id.*), and that "'the child's best interest is of paramount importance and cannot be altered by the parties.'" *Id.* at 305 (quoting *Shrivastava v. Mates*, 93 Md. App. at 327).

they have been found to be children in need of assistance or "CINA."[12]  It has little to do with the case before this Court.

More generally, a downward departure from the guidelines may sometimes be justified as in the best interest of the child, but a parent must make at least some effort to justify it.  Here, however, the parents asserted that they had no obligation to justify a downward departure (to zero).  Instead, they asserted the circuit court had no choice but to acquiesce in their agreement to waive the child's right to support.  The circuit court correctly rejected their assertion.[13]

We turn now to the parents' final argument—that the circuit court violated their federal constitutional right, as fit and proper parents, to determine how much to spend on the support of their child (and, by extension, to agree that Father has no obligation to provide child support to his son).  Father and Mother base their constitutional argument on *Troxel v. Granville*, 530 U.S. 57 (2000), a fractured decision that yielded six separate opinions, none of which commanded the assent of a majority of the Court.

In *Troxel v. Granville*, the Court considered a Washington state statute that empowered a trial judge to order a fit parent to grant visitation to any third party, over the

---

[12] When Mother's brief quotes *In re Joshua W.*, it uses ellipsis to omit the words "in foster care."

[13] Mother's brief raises at least two issues that neither parent presented to the circuit court.  For example, she argues that the court incorrectly calculated the amount of child support.  She also argues that the court had no authority to determine an arrearage and to require Father to pay it.  Because neither parent presented those issues to the circuit court, they are not preserved for appellate review.  Md. Rule 8-131(a).  We cannot reverse the circuit court for failing to consider issues that no one asked it to decide.

parent's objection, if the court determined that visitation was in the child's best interest. The statute "contain[ed] no requirement that a court accord the parent's decision any presumption of validity or any weight whatsoever[,]" but rather "place[d] the best-interest determination solely in the hands of the judge." *Id.* at 67.

In a plurality opinion joined by Chief Justice Rehnquist, Justice Ginsburg, and Justice Breyer, Justice O'Connor concluded that the statute deprived parents of substantive due process because it infringed upon their "liberty interest" in "the care, custody, and control of their children" (*id.* at 65) and their "fundamental right . . . to make decisions concerning the care, custody, and control of their children." *Id.* at 66-67. In reaching its decision, the plurality stressed "the sweeping breadth" of the statute—anyone could apply to the court for visitation—and the court's "broad, unlimited power" to override a parent's decision. *Id.* at 73. Justices Souter and Thomas concurred separately in the judgment, but not in the specific reasoning of the plurality opinion.

Justice O'Connor's plurality opinion relied in substantial part on earlier cases concerning who has the authority to make child-rearing decisions and when a state can override a parent's decisions about a child's education or employment. *Id.* at 65-66. Among other cases, the plurality cited and discussed *Meyer v. Nebraska*, 262 U.S. 390 (1923), which struck down a state statute that prohibited parents from teaching their children a language other than English; *Pierce v. Society of the Sisters of the Holy Names*, 268 U.S. 510 (1925), which struck down a state statute that prohibited parents from sending their children to religious schools; *Stanley v. Illinois*, 405 U.S. 645 (1972), which struck down a state statute that presumed that unwed fathers were unsuitable and

neglectful parents; and *Santosky v. Kramer*, 455 U.S. 745 (1982), which struck down a state statute that permitted a state to terminate a person's parental rights on proof by less than clear and convincing evidence. The plurality opinion did not cite or discuss any cases addressing a parent's legal obligation to provide adequate support for a child.

By contrast, in *Rivera v. Minnich*, 483 U.S. 574, 575 (1987), the Court had upheld a statute that permitted a state to establish paternity (and thus an obligation to pay child support) by only a preponderance of the evidence. In arguing that the statute was unconstitutional, the putative father relied on *Santosky v. Kramer*, 455 U.S. at 748, which held that due process required proof at least by clear and convincing evidence before a state could terminate a person's parental rights. The Court rejected the "tacit assumption of an equivalence between the State's imposition of the legal obligations accompanying a biological relationship between parent and child and the State's termination of a fully existing parent-child relationship." *Rivera v. Minnich*, 483 U.S. at 579. "[T]he primary interest of the [putative father]," the Court wrote, "is in avoiding the serious economic consequences that flow from a court order that establishes paternity and its correlative obligation to provide support for the child." *Id.* at 580. "In contrast," the Court observed, "in a termination proceeding the State is seeking to destroy permanently all legal recognition of the parental relationship." *Id.* In these circumstances, the Court reasoned that "the putative father has no legitimate right and certainly no liberty interest in avoiding financial obligations to his natural child that are validly imposed by state law." *Id.* Nothing in *Troxel* undercuts the Court's earlier statement that parents have "no liberty interest" in avoiding validly imposed financial obligations to their children.

24

Other courts have identified this same distinction between a parent's liberty interest in the care, custody, and control of a child and a parent's legal obligation to support a child. *See Dietz v. Dep't of Social Services Child Support*, No. 4:23-CV-04114-RAL, 2024 WL 1882165 (D.S.D. Apr. 30, 2024), at *4 (unpublished opinion) (stating that "parents do not have a constitutional right to avoid supporting their minor child or to be free from paying what child support amount a state-law system providing due process protection determines the parent to owe[]"); *Margolies v. Margolies*, No. 94,924, 2006 WL 2661220 (Kan. Ct. App. Sept. 15, 2006), at *6 (unpublished per curiam decision) (recognizing that under *Troxel* "parents have a fundamental right to decide the care, custody, and control of their children," but finding no constitutional issue because the only matter before the court "pertains to the trial court's determination of child *support*, not custody") (emphasis in original); *see also Gallaher v. Elam*, 104 S.W.3d 455, 461 (Tenn. 2003) (stating, in the context of an equal protection claim, that "[a]llocating a certain amount of financial support to one's children is a mandatory obligation, not a fundamental right[,]" and thus that "parents have no fundamental right to allocate support to their children as they see fit").[14]

---

[14] In his brief, the Attorney General cited an unpublished decision of the Supreme Court of Montana: *In re Marriage of Caffrey*, No. 00-307, 2002 WL 1484015 (Mont. 2002). In that case, the Montana court rejected a father's contention that *Troxel* prohibited a court from requiring him to make child support payments in accordance with Montana's mandatory guidelines. Under the Montana Operating Rules, Section 1, Paragraph 3(c)(ii), an unpublished memorandum opinion "shall not be citeable [sic] as binding precedent, but may be cited when relevant to establishing the application of law of the case, res judicata, or collateral estoppel; or in a criminal action or proceeding involving the same defendant or a disciplinary action or proceeding involving the same person." The Montana Supreme Court does not permit citation to its unpublished

25

Mother claims to find support in *Frase v. Barnhart*, 379 Md. 100, 124-25 (2003), where the Court relied on *Troxel* to reverse an interlocutory order that granted custody to a fit parent on the condition that she move with her child to a new residence and allow visitation with the child's former caretakers at some place other than the mother's current residence. *Id.* at 108. *Frase* does not advance the parents' position. The decision about where a fit parent and her child must live or where visitation must occur does not implicate the child's right to child support or the parent's obligation to provide support; it implicates the parent's fundamental right in the care, custody, or control of the child. To say that a court cannot dictate where a fit mother can live as a condition of retaining custody, as the Court did in *Frase*, is not to say that two fit parents can agree to waive their child's right to receive support from them.

In the final analysis, "*Troxel* was an extremely narrow decision" that "hinged 'on the sweeping breadth' of the Washington statute and 'the application of that broad, unlimited power.'" *Conover v. Conover*, 450 Md. 51, 70 (2016) (quoting *Troxel v. Granville*, 530 U.S. at 73). The liberty interest discussed in *Troxel*—the interest of fit parents in the care, custody, and control of their children—does not entitle those parents to exculpate one another from their legal obligation to support their children. The circuit court therefore did not err in rejecting the parents' contention in this case, that Mother and Father had a constitutional right to agree that Father would pay no child support.

---

opinions and disregards arguments based on unpublished opinions. *State v. Ferre*, 322 P.3d 1047, 1049 (Mont. 2014); *State v. Oie*, 174 P.3d 937, 939 (Mont. 2007); *State v. Little*, 861 P.2d 154, 159 (Mont. 1993). Consequently, the unpublished Montana opinion may not be cited as persuasive authority in Maryland. Md. Rule 1-104(b).

## CONCLUSION

The circuit court correctly considered child support in this matter, as the issue was appropriately presented for review to that court. In addition, the circuit court correctly applied the child support guidelines from Title 12 of the Family Law Article, because the use of these guidelines is mandatory for the determination of a child support award, unless the court finds that the application of the guidelines would be unjust or inappropriate and makes specific findings, including a finding about how deviating from the guidelines serves the child's best interest. Finally, the circuit court did not err in determining that Father owed child support and in determining that Father and Mother had no constitutionally protected liberty interest in agreeing that Father had no obligation to provide child support for their son.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE EVENLY DIVIDED BETWEEN APPELLANT AND APPELLEE.**